IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEBORAH  J. SACCO,                    )
                                      )
              Plaintiff,              )
                                      )
       v.                             )          Civil Action No. 04-1079
                                      )          Judge Joy Flowers Conti
SECRETARY OF VETERANS'                )          Magistrate Judge Lisa Pupo Lenihan
AFFAIRS,                              )
                                      )
              Defendant.              )


**REPORT AND RECOMMENDATION**


I.  **RECOMMENDATION**

  It is respectfully recommended that the Defendant's Motion for Summary Judgment be

denied.


II.  **REPORT**

  This case involves claims related to Defendant's (1) alleged failure to accommodate and

discriminatory treatment\termination of Plaintiff, Deborah J. Sacco ("Sacco"), in response to

Sacco's requests for accommodation of her respiratory disabilities, in violation of The

Rehabilitiation Act of 1973,[1] and (2) alleged retaliatory treatment and termination in response to Sacco's requests for accommodation and filing of Equal Employment Opportunity Commission ("EEOC") actions against it.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

Because a reasonable jury could find, on the basis of the record evidence, that

(1) Sacco is "disabled" within the meaning of the ADA, *i.e.*, that she suffers a "substantial limitation" of one or more major life activities;

(2) Sacco was, with accommodation, otherwise qualified for and able to do her job;

(3) Defendant failed to meet its duty to dialog in good faith and provide reasonable accommodation (such as transfer to a qualified-for and previously-held position, other assignment out of the blood-draw laboratory, or redress of the mold conditions in that laboratory); and

(4) Defendant discriminated against Plaintiff in treatment and/or termination owing to her disability or perceived disability;

Defendant's Motion for Summary Judgment as to a failure to provide reasonable accommodation and other disability discrimination  should be denied.

Similarly, because a reasonable jury could find retaliation on the basis of the record evidence, the balance of Defendant's Motion for Summary Judgment should be denied.

---

1.  The Rehabilitation Act prohibits federal agencies from discriminating against disabled employees in matters of hiring, placement or advancement.  See 29 U.S.C. § 703 *et seq.*; Mengine v. Runyon, 114 F.3d 415, 418 (3d Cir. 1997).  Congress has made clear that identical standards apply to cases under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act.  See McDonald v. Commonwealth of Pa., 62 F.3d 92, 94 (3d Cir. 1995).

A. **Statement of Facts and Procedural History**

This case is framed as a civil action for relief in consequence of Defendant's alleged failure to accommodate, and discriminatory treatment and subsequent termination of Plaintiff in response to her request for accommodation,[2] and Defendant's alleged retaliatory treatment and termination of Plaintiff in response to her initiation of EEOC charges against it.

The employment and medical histories of this case are lengthy and somewhat complex. Plaintiff was employed by Defendant as an LPN, and later a Health Technician, for approximately fifteen (15) years, from August, 1988 until her termination in December, 2003. More specifically, Plaintiff was employed as an LPN in several sections/departments of the Veterans' Affairs Medical Center at Butler, Pennsylvania ("the VA") for approximately ten years. During that time she progressed from her initial GS-3 level to a GS-6, step 4.

In 1998, she became a Union Steward and Plaintiff voluntarily elected to take a GS-5 Health Tech position in the VA's domiciliary. She was given two eight-hour days per week to devote to Union business. In May, 1999, Plaintiff was written up for having a minimum leave balance.[3] In May, 2000, it was noted that Plaintiff had used 138.5 hours of sick leave in the past

---

2. The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability . . . in regard to . . . advancement, or discharge of employees, . . . and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. at § 12111(8).

3. Plaintiff received, as a job benefit, approximately 104 hours of sick leave per annum. See Defendant's Concise Statement of Material Facts at ¶ 10.

year, and she was placed on a six-month "sick leave certification", requiring medical documentation for any such absence. Six months later, in November, 2000, the extent of Plaintiff's absences had not improved and her certification period was extended another six months, to May, 2001, at which time the certification requirement was removed.[4] It should be noted that Plaintiff assumed the position of Union President in June, 2000 and was then given 24 hours each week for Union business; she was also reassigned from the domiciliary. In March, 2001, she was reassigned again, this time to the blood-draw laboratory (the "lab"), and the time provided for Union business was adjusted to four hours per day, or 20 hours per week. It is Plaintiff's testimony - and that of at least one co-worker - that she became increasingly ill, suffering frequent bronchitis and pneumonia, after her transfer to the blood-draw lab, although the evidence suggests health problems/significant absence from work prior thereto.

The record indicates that Plaintiff had recurrent pneumonia in December, 2001 and again in February, 2002; in February she was hospitalized for a week. In late June, 2002, Plaintiff was written up for being late to work twice. And in July, 2002, approximately 14 months after being released from sick leave certification, Plaintiff was placed back on a medical certification requirement. Defendant attests that between May, 2001 and June, 2002, Plaintiff was off work in excess of 450 hours (*i.e.*, 11 weeks), including approximately 130 hours of sick leave and 128 hours of Leave Without Pay ("LWOP").

---

4. Neither Defendant's Motion for Summary Judgment nor its Concise Statement of Material Facts suggests that Plaintiff failed to provide the requisite medical documentation for her absences during these certification periods.

Plaintiff's work attendance appears to have continued to deteriorate during 2002. Defendant cites six incidents of lateness/tardiness between July 30 and August 27, with tardiness recurring in October and December. In addition, Plaintiff was consecutively absent from work from August 28 through September 23, 2002 for a combination of union business, training, and sick leave. In October, 2002, Plaintiff had exhausted her sick leave and was given an advance. In November or December, she voluntarily applied for an available GS-4 Laboratory Technician position, with no immediately result. Defendant indicates that Plaintiff used more than 156 hours for illness between July 3 and December 13, 2002. On December 31, 2002, Plaintiff was tardy, left work early to go to her doctors, and indicated she would not be returning for the rest of the week; she invoked the FMLA. See Defendant's Concise Statement of Material Facts at ¶¶ 36-37.

Notably, Plaintiff's evidence suggests that a mold problem arose in the blood-draw laboratory as a result of construction occurring in calendar year 2000, and that Defendant was aware of the existence of the mold growth no later than Spring, 2002, when it instructed lab employees to conceal the condition from inspectors. See Deposition of Ms. Waddell; see also Plaintiff's Response to Defendant's Concise Statement of Material Facts ("Plaintiff's Response") at ¶ 109. Plaintiff further contends that, as an individual suffering pre-existing respiratory problems, she was particularly susceptible to adverse health effects from the Stachybotrys mold present in the lab. See Plaintiff's Statement of Additional Material Facts at ¶ 9. She attributes her deteriorating respiratory condition to her continued employment in the lab.

In early January, 2003, Plaintiff continued to be absent from work; she provided documentation and requested both LWOP and FMLA status. In addition, Plaintiff applied for an

open position for an LPN in the Domiciliary and requested transfer out of the lab to this GS-6 position as an accommodation.  See Defendant's Concise Statement of Material Facts at ¶ 43. Her treating physician, Dr. Shetter, indicated that Plaintiff was suffering from chronic asthma and bronchitis, with recurrent pneumonia, attributing these conditions at the time to stress, and recommended that she be transferred out of the lab and returned to her prior position in the domiciliary.  See id. at ¶ 45.  At this time, Plaintiff also resigned from her position as Union President and was assigned to the lab full-time (i.e., with no further allowance for Union activities).  Defendant suggests that, owing to the increase to Plaintiff's hours upon relinquishment of her Union position, it was then necessary to give Plaintiff GS-3 duty assignments in the lab at her GS-5 pay level.  See id. at ¶ 58 (asserting that when Plaintiff resigned as Union President she was "assigned to the laboratory full-time as a Health Technician, GS-5" but "performed the same duties as a Medical Laboratory Aide (GS-3) but, unofficially and at the discretion of the VA, at her GS-5 grade and pay").

On January 13, 2003, Plaintiff was reprimanded for being absent without leave ("AWOL") and tardy, and Defendant requested medical information concerning her ability to work in the lab.  Plaintiff's work absences continued and when her annual leave was exhausted she was given FMLA status from February 5 to February 20, 2003, later extended to March 3, 2003.  By letter of February 10, 2003, Plaintiff reiterated her requested for accommodation and suggested transfer to the LPN position.  Two days later, Plaintiff was selected by Defendant for the GS-4 Laboratory Technician position for which she had applied in late 2002; Plaintiff declined.  See Defendant's Concise Statement of Material Facts at ¶¶ 66-67.  The evidence

suggests that Plaintiff was then hopeful of obtaining the LPN domiciliary position.  See id. at ¶ 61 (reporting that Plaintif had stated she was "still interested" in the GS-4 position if she did not get the LPN position).  The following month, however, Defendant filled the LPN position by transfer of another GS-6 LPN.

 As Plaintiff's absenteeism continued, on March 25, 2003, Defendant requested that she complete a Fitness for Duty Exam (an "FDE").  The exam was completed by Defendant's employee-RN, Nurse Kirsch, on April 22, 2003.  Ms. Kirsch noted that Plaintiff had been hospitalized five times for lung problems; required oxygen, inhalers and nebulizers; and had cut back on but not ceased smoking.  She further noted that Plaintiff needed to complete/provide information regarding pulmonary function testing.  It was her recommendation at this time - and as communicated to the Chief of Medical Staff on May 6, 2003 - that Plaintiff not continue work in the lab.  See Defendant's Concise Statement of Material Facts at ¶ ¶ 80, 89.

On May 17, 2003 Plaintiff filed an EEOC charge against Defendant alleging disability discrimination in connection with its denial of transfer to the LPN domiciliary position.  Eleven days later, on May 28, Nurse Kirsch altered her recommendation, now concluding that Plaintiff could continue in her present position in the lab pending Defendant's receipt of her pulmonary function testing results.  See id. at ¶ 94. Significantly, Plaintiff's May testing results suggest some severely-reduced pulmonary function.  In addition, Plaintiff represents that she completed testing

as requested and that these test results were timely provided to Defendant.  <u>See</u>

Plaintiff's Statement of Additional Material Facts at ¶ 5; Plaintiff's Response at ¶¶ 92, 97.[5]

At this same time, *i.e.*, early May, Plaintiff also advised Defendant that she was

experiencing severe back problems.  Her last day of work attendance was June 10, 2003.

Thereafter, Plaintiff called off work for bereavement and for back pain, without medical

documentation.  On July 17, 2003, Defendant prepared an FDE Memo concluding that Plaintiff

was able to work in the lab, and she was charged 423 hours AWOL (accruing from January 1,

2003 through July 22, 2003).  Although Plaintiff maintains that she was not notified of any

AWOL status until several months later, in late July, 2003 she provided medical documentation

from Dr. Levy indicating that she was suffering short-term disability related to degenerative

lumbar disease and would be absent eight weeks from the date of her exam.[6]  However, because

the documentation indicates that Plaintiff was not seen by this physician until July 24th,

Defendant declined to accept it to authorize leave for the six weeks prior.

On September 15, 2003, Defendant notified Plaintiff that her documentation was

inadequate and that she was being charged AWOL for the period from June 11 through July 24,

---

5.  <u>See</u> <u>also</u> Defendant's Concise Statement of Material Facts at ¶ 99 (noting that in mid-June the Medical Chief of Staff detailed review of Plaintiff's medical documents but concluded that further testing results  were necessary to determine the extent to which Plaintiff's respiratory problems might be controlled by, *e.g.*, medication, oxygen, a complete cessation of smoking).

6.  It appears from the record that Plaintiff also provided a second document from this physician, indicating her date of return to work as "indeterminate" but that Defendant objected to this document as lacking an original signature by the physician.  <u>See</u> Defendant's Memorandum of Law at 32-33.

2003.[7]  It also denied her subsequent request for leave from September 7 through November 1,

2003.  See Defendant's Concise Statement of Material Facts at ¶¶ 118-19.  A few days later,

Plaintiff was again instructed to return to work and further advised that the medical lab had been

temporarily relocated.  See id. at ¶ 121.[8]  Plaintiff's evidence is that she submitted further medical

documentation regarding her temporary lumbar disability on September 18, including information

from Dr. Kosetak detailing her epidural injection appointments.  See Plaintiff's Brief in

Opposition at 25.

     In mid-October, Defendant provided Plaintiff with a Notice of Proposed Removal for

reasons including absence without leave and failure to follow instructions regarding requesting

leave and reasonable accommodation.  Plaintiff's employment was terminated on December 12,

2003.

     This action was initiated in late July, 2004.  At the time of discovery in this case, Plaintiff

was employed as a full-time LPN and her respiratory condition had improved.

---

7.  Plaintiff asserts that medical documentation of a progressive degenerative lumbar disease - as opposed to an accident or sudden-onset condition - provides reasonable justification for absence due to back pain prior to the date of the physician's examination/ report.

8.  This relocation apparently followed mold testing conducted in August, 2003 by U.S. Micro-Solutions, Inc.  See Defendant's Concise Statement of Material Facts at ¶¶ 113-14.  See also Defendant's Memorandum of Law at 26 (stating that the lab was moved from its former area on August 21, 2003).

B. **Motion for Summary Judgment**

Summary judgment is to be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

All doubts as to the existence of a genuine issue of material fact are resolved against the moving party, and the entire record is examined in the light most favorable to the nonmoving party. Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). However, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257.[9]

As Defendant observes, summary judgment is intended to provide an opportunity for the "dispos[ition] of meritless cases." See Defendant's Memorandum of Law at 3 (quoting Big Apple BMW, Inc. v. BMW of N. Am., 974 F.2d 1358, 1362 (3d Cir. 1992)). However, final credibility determinations on material issues cannot be made in the context of a motion for summary judgment; nor may the District Court weigh the evidence. See Josey v. John R. Hollingsworth Corp., 996 F.2d 632 (3d Cir. 1993).

---

9. Cf. Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995) (cautioning that the *prima facie* case under the McDonnell Douglas formulation government federal employment discrimination cases "is not intended to be onerous").

### C.  Analysis

**         1.  Disability Discrimination**

To survive summary judgment as to her *prima facie* case of disability discrimination under the ADA, Plaintiff must provide evidence sufficient to enable a reasonable jury to find that (1) she is "disabled" within the meaning of the ADA; (2) she is "otherwise qualified" to perform the essential functions of the job, with or without reasonable accommodation; and (3) she has suffered an adverse employment decision as a result of discrimination.  See, *e.g.*, Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996).  To the extent that Plaintiff was only able to perform her job with reasonable accommodation, and requested such accommodation, it behooved Defendant to meaningfully attempt to provide it.  See discusion, *infra*.  To the extent that Defendant has offered alternative, non-discriminatory reasons for its adverse actions, Plaintiff must provide sufficient evidence to reasonably infer pretext.  See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (requiring that a plaintiff, to defeat summary judgment, submit evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action").[10]

---

10.  In other words, under Fuentes, a plaintiff must "point to evidence that proves . . . discrimination in the same way that critical facts are generally proved - based solely on the natural probative force of the evidence."  Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (*en banc*).

a.  <u>Disability</u>

A "disability" for purposes of the ADA is a physical or mental impairment that effects a "substantial limitation" on one or more of the major life activities of such individual; a record of such impairment; or being regarded has having such impairment.  <u>See</u> 42 U.S.C. § 12102(2).  The accompanying Regulations define breathing as one such major life activity.  <u>See</u> 29 C.F.R. § 1630.2(i).  "Substantial limitation" is itself assessed by reference to the plaintiff's ability to perform such activity in comparison to the average person in the general population; more specifically, it entails an assessment of the nature and severity of the impairment, its duration/expected duration, and its impacts.

In the case at hand, there can be no dispute regarding Plaintiff's sufficient establishment of evidence to support a rational finding in her favor on the issue of disability.  Plaintiff's respiratory conditions include asthma, chronic obstructive pulmonary disease ("COPD"), lung lesions, emphysema and pulmonary fibrosis.  Her medical history includes recurrent bronchitis and recurrent hospitalized pneumonia.  The results of her pulmonary function tests indicate that Plaintiff has markedly reduced lung capacity (51% and 63%), and that same hospital's records also note Plaintiff's dyspnea.  <u>See</u> Plaintiff's Statement of Additional Material Facts at ¶¶ 5, 6 and attachments thereto.  A co-worker's testimony is that, as Plaintiff's respiratory condition deteriorated as she continued to work in the lab, Plaintiff continually hacked, coughed and gasped for air.  <u>See</u> Plaintiff's Statement of Additional Material Facts at ¶ 10.

The decision of other Circuits to which Defendant cites in support of its assertion that Plaintiff's respiratory impairments do not rise to the level of a disability are largely inapposite.

See Zirpel v. Toshiba Am Info. Sys., Inc., 111 F.3d 80 (8th Cir. 1997) (concluding plaintiff was not disabled owing to breathing difficulties during infrequent panic attacks); Robinson v. Global Marine Drilling  Co., 101 F.3d 35 (5th Cir. 1996) (concluding that repeated shortness of breath with stair-climbing did not demonstrate sufficiently limited life activity of breathing).

Nor does the Court find any merit in Defendant's assertion that Plaintiff's tobacco/nicotine addiction belies her claim of respiratory disability.[11]  The record indicates Plaintiff's reduced cigarette usage but unsuccessful attempts to entirely stop smoking.  As the Court does not doubt that Defendant is familiar with the addictive properties of cigarettes, it must observe that this line of argument appears most inappropriately directed at Plaintiff's moral character.  For while it is certainly true that an individual suffering from respiratory disabilities should not smoke cigarettes, it is also resoundingly self-evident that continued patterns of addiction do not belie disabilities.

Defendant's assertion that the keeping and breeding of cats by Plaintiff and her spouse casts doubt on the veracity of Plaintiff's alleged respiratory impairments requires no further discussion.  See Defendant's Brief in Opposition at 9 (noting absence of any evidence that Plaintiff has related allergies or that cat care involves any strenuous activity on her part).

And Defendant's following assertion - that Plaintiff is not suffering any substantial limitation of a major life activity because she is able to perform her job well when present - is similarly without merit  As Plaintiff duly notes, it is her assertion that the major life activity

_____

11.  See Defendant's Memorandum of Law at 18 (asserting that "Plaintiff's 30-year-long habit belied that her breathing was substantially limited" and that "[t]o argue otherwise is disingenuous").

13

limited by her respiratory conditions is breathing, not working.  See id.[12]  Finally, some

improvement in Plaintiff's respiratory condition since leaving Defendant's employ does not entitle

Defendant to a summary finding that Plaintiff was not "disabled."  Indeed, such improvement may

tend to support Plaintiff's contentions that her deteriorating respiratory function was related to the

then- uncorrected - and allegedly deliberately concealed - unhealthy conditions in Defendant's

laboratory.[13]

      b.  "Otherwise Qualified"

      A "qualified individual with a disability" is one who (1) satisfies the prerequisites for the

position, e.g., possesses the appropriate educational background and licenses; and (2) can perform

the essential functions of the position held or desired, with or without reasonable accomodation.

See Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998).  Defendant concedes

that Plaintiff was able to do her job as a Health Technician when present.  It further expressly

concedes that she was qualified for and able to do her prior job as an LPN.  See Defendant's

Memorandum of Law at 21 (acknowledging that "no one can dispute that [Plaintiff] was qualified

for the [vacant, funded LPN] position because of her prior experience as an LPN").

---

12.  See also id. ("Quite simply, the fact that Plaintiff was capable of performing her job is not
relevant to the issue of whether Plaintiff was substantially limited in her ability to breathe.").

13.  Although Defendant devotes some time to refutation of Plaintiff's degenerative lumbar
disease as a disability within the meaning of the Rehabilitation Act, Plaintiff herself discusses it
clearly as a short-term disability arguably entitling her to excused absence with medical
documentation and she did not, as Defendant expressly observes, request accommodation for her
lumbar disease.  See Defendant's Memorandum in Support at 17 (citing Plaintiff's deposition
testimony); see also Plaintiff's Brief in Opposition at 6-10 (arguing disability based solely on
respiratory/pulmonary condition); id. at 26 (asserting that a reasonable jury could find that
Defendant did not have a legitimate basis for denying Plaintiff's requests for LWOP related to her
treatment for lumbar disease).

Defendant's only basis for contending that Plaintiff was not otherwise qualified for these positions is her history of absenteeism.  See, e.g., Defendant's Memorandum of Law at 19-20 (asserting, somewhat sophistically, that Plaintiff was unable to perform the essential duties of her job because those duties require an employee to be physically present).  But Plaintiff expressly ascribes her deteriorating health problems and repeated absences from work during her tenure in the lab to Defendant's failure to accommodate her respiratory disability.[14]  Most certainly, then, a reasonable jury could conclude that, with disability accommodation (such as reassignment out of the lab or remedy of the mold conditions in the lab), Plaintiff would no longer be repeatedly absent and would be able to perform her job.

   c.  Related Employment Decisions

   (i)  Failure to Make Reasonable Accommodation

Discrimination under the ADA encompasses a failure to make reasonable accommodation, as well as adverse employment actions.  See, e.g., Taylor v. Phoenixville School Dist., 174 F.3d 142, 151 (3d Cir. 1999).[15]  The reasonableness of a particular accommodation is, generally, a cost-benefit analysis.  See Gaul, 134 F.3d at 580-81; Skerski v. Time Warner Cable Co., 257 F.3d 273, 284 (3d Cir. 2001) (directing that, on issue of reasonable accommodation,

---

14.  See Plaintiff's Brief in Opposition at 11 (asserting that Plaintiff suffered increasing bouts of bronchitis and hospitalized pneumonia after being assigned to the lab); id. (citing co-worker's testimony that Plaintiff's attendance at lab was initially good, but that she began to be increasingly absent and to evidence respiratory difficulties in the lab).

15.  But see Thursby v. City of Scranton, 2006 WL 1455736, *5 n. 7 (M.D. Pa. May 25, 2006) (questioning whether, under Taylor, a plaintiff may be entitled to recovery for employer's failure to affect reasonable accommodation that does not culminate in other tangible adverse employment action, such as a causally-related termination).

employee bears burden of identifying an accommodation the costs of which facially do not clearly exceed its benefits); id. (further directing that, thereafter, employer must demonstrate that proposed accommodation would create undue hardship); cf. Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 670 (3d Cir. 1999) (explaining that summary judgment may be granted for defendant only "in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly").[16]

As the parties acknowledge, an employee and her employer have a joint responsibility to determine what accommodations are reasonably necessary and possible.  It is therefore expected that they will engage in a good faith, interactive process and dialog in attempting to enable the employee to continue her employment.  See, e.g., Taylor, 174 F.3d at 157 (noting that "both parties have a duty to assist in the search for reasonable accommodation and to act in good faith"); id. at 159 (looking to whether the employee had "provide[d] the employer with enough information that, under the circumstances, the employer [could] fairly be said to know of both the disability and the desire for accommodation"); 29 C.F.R. § 1630.2(o)(3) (explaining that "it may be necessary for the employer to initiate an informal, interactive process with the employee in need of accommodation", which process should identify the employee's limitations and "the potential reasonable accommodations that could overcome those limitations"); 29 C.F.R. Pt. 1630,

---

16.  See also Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 138 (2d Cir. 1995) (instructing that "reasonable" is a relational term which "evaluates the desirability of a particular accommodation according to the consequences it will produce) (cited with approval in Skerski, 257 F.3d at 284); id. (holding that once a plaintiff has suggested a plausible accommodation, the risk of non-persuasion falls on the defendant - that is, defendant's burden of persuading the factfinder that the proposed accommodation is unreasonable merges with its burden of showing, as an affirmative defense, that such accommodation would cause undue hardship).

App. §§ 1630-9 at 359 (providing that "[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation").[17]

In the case *sub judice*, each party alleges the other's absence of good faith, as evidenced by failures to participate in and advance the interactive process.  Most important to this Court's assessment of Defendant's Motion for Summary Judgment are Plaintiff's contentions that Defendant repeatedly failed to provide Plaintiff the necessary paperwork when requested, repeatedly failed to undertake reasonable efforts at determining possible accommodations, and generally demonstrated a complete lack of initiative in response to Plaintiff's requests for accommodation.

For example, when Plaintiff initially requested relocation from the blood-draw laboratory via transfer to an open LPN position in the Domiciliary - a position which she previously held and for which Defendant does not dispute she was otherwise qualified - her request was denied.  In support of this decision, Defendant notes that Plaintiff, while involved in Union leadership activities, had voluntarily taken a step-down to a GS-5 position from the LPN level of GS-6.  This Court is not aware of - nor does Defendant point to - any case law suggesting the existence of a bright line test for an accommodation involving a step-up from the employee's current position, *i.e.*, a holding that no transfer involving a step-up can ever be a reasonable accommodation. To the contrary, it would appear that the question raised under the applicable standard for assessing what is a "reasonable accommodation", *i.e.*, whether the anticipated burdens of the

---

17.   Both the regulations and the EEOC's interpretive guidelines are cited in Defendant's Memorandum of Law at 12.

accommodation would exceed the benefits, is a classic jury question.[18]   In addition, although the

record suggests that Defendant had some flexibility with regard to positions and accompanying

salaries, there is no indication that it ever explored this manner of accommodating Plaintiff's

request for reassignment (*e.g.*, via a counter-offer of transfer to the LPN position at a salary the

same as Plaintiff's current salary).[19]

---

18.  Cf. Defendant's Memorandum of Law at 5 (asserting that a request for transfer to a higher
grade and rate of pay is not a request for reasonable accommodation as a matter of law); 29
C.F.R. Pt. 1630, App. 1630.20(o) (noting that "an employer is not required to promote an
individual with a disability as a reasonable accommodation").  But see id. at 14 (acknowledging
that"[n]either the ADA nor the Rehabilitation Act provides a closed-end definition of 'reasonable
accommodation'"); Burskirk v. Apollo Metals, 307 F.3d 160, 170 (3d Cir. 2002) (cautioning that
"generally, the question of whether a proposed accommodation is reasonable is a question of
fact") (cited in Thursby, 2006 WL 1455736 at *5).

  See also Defendant's Memorandum of Law at 11 (citing the regulations and case law in
acknowledging that reassignment to an already funded, vacant position at the same grade or level
is mandatory absent undue hardship on the employer).  This accommodation "floor" clearly does
not, however, speak to the scope of what other accommodations may be reasonable, and
therefore required, in a particular case.

  The Third Circuit has explained that, where a plaintiff alleges a failure to accommodate by
transfer, she must demonstrate that (1) there was a vacant, funded position; (2) such position was
at or below the level of the plaintiff's former job; and (3) plaintiff was qualified to perform the
position with reasonable accommodation.  See Donahue v. Consolidated Rail Corp., 224 F.3d
226, 230 (3d Cir. 2000).  This Court's extensive inquiry has found, however, no guidance
addressing the effect of a prior voluntary step-down (from a position for which the employer
expressly acknowledges plaintiff remains qualified) on the scope of former jobs most
appropriately considered in attempting reasonable accommodation.

19.  Cf. Plaintiff's Brief in Opposition at 15 (stating that "had Plaintiff received the LPN position,
she would have received the nearest pay on the GS-6 scale to what she made as as GS-5, step 10,
health tech without cutting her pay") (citing Plaintiff's Statement of Additional Material Facts at
¶ 19); id. (asserting that "the record is devoid of any evidence that the Defendant sought,
discussed or suggested any alternate form of accommodation").

Similarly, when Plaintiff subsequently modified her requested accommodation, indicating her desire for transfer to "any position out of the lab", Defendant was presumably in the best possession of information as to possible accommodations,[20] yet Plaintiff's evidence (and Defendant's briefing) suggests that it continued to place on its employee the sole responsibility for identifying and proposing specific accommodations.[21]

Finally, the record suggests that Defendant knew or had reason to know of a mold contamination problem in its lab before Plaintiff did.  And Plaintiff's evidence further suggests that

---

20.  See Plaintiff's Brief in Opposition at 16 (asserting that when the accommodation forms were finally provided to Plaintiff's counsel in September, 2003, Plaintiff was in little position to identify current vacancies as she had been off work since June 10, 2003 owing to short-term disability related to her degenerative lumbar disease).  Cf. Defendant's Memorandum of Law at 5 (asserting that Plaintiff's "request [for accommodation by transfer out of the lab] fails because she failed to identify other vacant, funded positions whose essential duties she could perform . . . ."); id. at 22-3 (stating that this request was "not reasonable as a matter of law").

In support of its assertion that the Court should grant summary judgment owing to Plaintiff's failure to identify other specific alternative positions at the time of her request, Defendant cites a case in which there was virtually no record that the employee had even requested a transfer and in which the Court observed that, to establish his case, the employee would be required to produce evidence of the availability of reasonable accommodation.  See id. at 23 (citing Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir. 1996).

21.  Defendant's assertion that this request was overly broad/general and therefore unmeetable/unreasonable is misguided.  See Defendant's Memorandum of Law at 14-15, 22 (discussing cases rejecting employees' requests for reduced stress as unreasonably seeking "an ambiguous, perhaps unattainable goal").  Unlike requests in cases relied upon by Defendant holding "reduced stress" to be too elliptic, the request in this case was sufficiently specific to commence a dialog with the employer.  That is, while an employer cannot be expected to know whether any particular responsive action would meet the requested accommodation of reducing an employee's stress, Defendant was certainly in a position to know whether a particular responsive action would meet the requested accommodation of transfer from the lab.

19

Defendant attempted to conceal this health-hazard, and failed to either remove the contamination or proffer Plaintiff any other reasonable accommodation for her deteriorating respiratory condition, despite such knowledge.  Cf. Defendant's Memorandum of Law at 20 (urging the Court to conclude Plaintiff was not otherwise qualified to perform her Health Technician duties because *she* was not aware of any possible accommodation which would enable her to continue work in the lab without respiratory illness); see also Plaintiff's Brief in Opposition at 15-16; 29 C.F.R. Pt. 1630, App. 1630.2(o) (directing that an employer "may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified").

(ii)  Adverse Employment Actions

As discussed, *supra*, Plaintiff is protected from discrimination on the basis of her disability.  On this issue, Plaintiff claims that Defendant committed disability discrimination by denying her claims for LWOP, relatedly charging her as AWOL, and ultimately terminating her employment. See Defendant's Memorandum of Law at 2.

(d)  Pretext

In response to Plaintiff's claims of failure to accommodate and discriminatory treatment, Defendant proffers significant evidence of Plaintiff's asserted failure to advance the accommodation dialog and to provide timely and adequate supporting medical documentation regarding both her respiratory and degenerative lumbar disabilities.  See, discussion *supra*. See also Defendant's Memorandum of Support at 27 ("It was Plaintiff's inability to abide by VA regulations concerning providing legitimate medical excuses which caused her separation, not her

medical condition.").  Plaintiff, however, disputes numerous of these material facts.  For example, Plaintiff contends that she repeatedly requested the appropriate documents to make a formal request for accommodation from her employer, but that such requests were ignored until made by Plaintiff's counsel in September, 2003.  Plaintiff also contends that items of medical documentation requested in connection with her "fitness for duty" exam (*e.g.*, her pulmonary function studies) were timely provided, despite Defendant's assertions to the contrary.  The parties also dispute the reasonable scope of medical/disability leave encompassed by Dr. Levy's July 24, 2003 report regarding Plaintiff's lumbar disease (*i.e.*, whether the medical report of this degenerative condition reasonably excused Plaintiff's absence from work for six weeks prior and whether such report should reasonably read to excuse continuing absence beyond early September).

In addition, Defendant somewhat misses the point in contending that Plaintiff  suffered no disability discrimination because its adverse employment actions were based on inadequate performance.  For in discussing its decisions leading to termination, Defendant cites its reliance on its judgment that Plaintiff was unable to perform her position due to excessive absence.  Defendant was, however, aware, at the time it began this course of adverse employment decisions, of Plaintiff's asserted disability and request for accommodation.  It therefore had an affirmative obligation in that regard.  An employer's failure to meaningfully attempt reasonable accommodation for disability, if it leads to discharge for performance inadequacies resulting from those disabilities, amounts to a discriminatory discharge.  See, *e.g.*, Borkowski, 63 F.3d at 143. The question of the extent to which the performance inadequacies for which Plaintiff was assertedly discharged resulted from her disability is for the jury.

In light of the foregoing, this Court should deny Defendant's Motion for Summary Judgment as to Plaintiff's claims of failure to accommodate and other disability discrimination.

### 2. Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that (1) she engaged in protected activity; (2) Defendant took adverse employment action(s) against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. See, *e.g.*, Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995). The evaluation of a causal connection is a fact-specific inquiry which looks at the record as a whole. See Farrell v. Planter's Lifesavers Co., 206 F.3d 271, 279 n. 5 (3d Cir. 2000).

Plaintiff's alleged protected activities include her (a) requests for accommodation (made in January, February and September, 2003);[22] (b) filing of charges with the EEOC in May and September, 2003; and (c) September 18, 2003 correspondence to Defendant alleging retaliation and threatening legal action in response. See Plaintiff's Brief in Opposition at 18.[23] Defendant's alleged retaliatory conduct includes (a) denying Plaintiff's requests for LWOP for June 10, 2003 through July 24, 2003 and from September 7, 2003 through the date of her termination and,

---

22. Defendant's suggestion to the contrary notwithstanding, the "protected activity" underlying a potential retaliation claim includes a request for accommodation. See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003) (noting entitlement of such request, as well as filing of official complaint with EEOC, to protection from retaliation).

23. Plaintiff elsewhere also alleges that Defendant's retaliatory conduct was related to Plaintiff's prior participation, as a Union representative, in the filing of EEOC charges by or on behalf of other employees. See, *e.g.*, Complaint at ¶ 44.

relatedly, declaring Plaintiff AWOL for such periods; and (b) proposing Plaintiff's termination in October, 2003 and effectuating such termination on December 12, 2003.  See id.[24]

As Plaintiff observes, the temporal relationship between the protected activity and the adverse employment action is an important component in assessing the requisite causal relationship.  See, e.g., Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).   The standard is not, however, simply post hoc, ergo propter hoc.[25]  In this case, Plaintiff has demonstrated sufficient evidence of a temporal relationship. On the other hand, Defendant proffers compelling alternative reasons for its conduct.  For example, it notes Plaintiff's extensive absence from work without contemporaneous medical excuse, as required by the terms of her employment. Similarly, Defendant disagrees with Plaintiff's assertion that a treating physician's report of disability due to lumbar degenerative disease (rather than sudden injury) is sufficient medical documentation to support her absence from work for six weeks prior to her visit to that physician. Compare Defendant's Memorandum of Law at 31  with Plaintiff's Brief in Opposition at 20.

At bottom, Defendant's decisions regarding Plaintiff's LWOP/AWOL status and ultimate termination relate, of course, to the parties' disputes regarding discriminatory and/or retaliatory

---

24. Plaintiff elsewhere also alleges that Defendant's retaliatory conduct included requiring Plaintiff to take a "fitness for duty" exam within three months of her requests for accommodation.  See Plaintiff's Brief in Opposition at 19-20.  It is less clear to the Court how such request constitutes a retaliatory adverse employment action, and the Court considers it least probable of all that a reasonable jury would so find.

25. See Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 n. 10 (3d Cir. 1996) (stating that "timing alone will not suffice to prove retaliatory motive"); cf. Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997) (discussing whether timing alone can ever be sufficient to establish causal link and concluding that timing must be "unusually suggestive" of retaliatory motive before causal link will be inferred).

23

motive/treatment, Plaintiff's medical conditions (both respiratory and lumbar), and the timeliness and sufficiency of Plaintiff's provision of work-absence-related medical documentation. <u>See generally</u> Defendant's Memorandum of Law at 34-36.  Though it appears significantly more possible that a reasonable jury would conclude that Plaintiff  suffered disability discrimination than retaliation, the Court should not, on the record before it, conclude that a finding of retaliation would be unsustainable.  Rather, in light of the temporal relationship and other circumstantial evidence, it is possible that a jury could find a causal connection between Defendant's adverse employment actions and Plaintiff's statutorily-protected activity.[26]

## III. <u>CONCLUSION</u>

Owing to the establishment of genuine questions of material fact as more fully set forth above, it is recommended that Defendant's Motion for Summary Judgment be denied.

In accordance with the Magistrates Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the

---

26.  <u>Cf.</u> <u>Lawrence v. National Westminster Bank N.J.</u>, 98 F.3d 61, 67 (3d Cir. 1996) (noting that "[o]n summary judgment, it is not the Court's role to weigh the disputed evidence and decide which is more probative" and that "the question is whether the record could support an inference that the employer did not act for a non-discriminatory reason") (citations omitted); <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280 (3d Cir. 2000).  <u>See</u> <u>Kaufer v. UPMC Health Plan, Inc.</u>, 2006 WL 1984636 (W.D. Pa. July 13, 2006) (denying summary judgment on disability discrimination and retaliation claims).

objections shall have seven (7) days from the date of service of objections to respond thereto.

Failure to file timely objections may constitute a waiver of any appellate rights.




/s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
United States Magistrate Judge



Dated: August 24, 2006


cc:     The Honorable Joy Flowers Conti
        United States District Judge

        All Counsel of Record

25